**E-FILED**
Thursday, 24 March, 2016  04:17:55 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| ORTHOFIX INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01463-SLD-TSH |
| | ) | |
| MELISSA GORDON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

ORDER

Plaintiff Orthofix Inc. ("Orthofix"), a medical device company, is suing Defendant Melissa Gordon, a former employee, for violating the non-solicitation, unfair competition, and nondisclosure provisions of her employment contract; appropriating trade secrets in violation of, the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1–9; and tortiously interfering with its business relations.  Am. Compl., ECF No. 23.  Before the Court are Gordon's motion for summary judgment, ECF No. 76; Gordon's motion for leave to file under seal the exhibits to its motion for summary judgment, ECF No. 77; Orthofix's motion for leave to file under seal the exhibits to its Response, ECF No. 84; Gordon's motion for leave to exceed the type volume limitations in her Reply and motion for leave to file attachments thereto under seal, ECF Nos. 86, 87; and Gordon's motion for leave to supplement her motion for summary judgment, ECF No. 94.  For the following reasons, the motion for summary judgment is DENIED.  The other motions are GRANTED, except for the motion for leave to supplement, which is DENIED.

# BACKGROUND[1]

Orthofix sells "bone growth stimulators," which purportedly promote the healing of broken bones.  Three companies dominate this market—Orthofix, DonJoy Orthopedics ("DJO"), and Biomet.  *Orthofix, Inc. v. Hunter*, No. 15-3216, 2015 WL 7252996, at *2 (6th Cir. Nov. 17, 2015).  Although the devices are ultimately sold to the patients of neurosurgeons and orthopedic spine surgeons, the companies peddle the devices directly to prescribing physicians, who sometimes take a cut of the retail purchase price.  *Orthofix, Inc. v. Hunter*, 55 F. Supp. 3d 1005, 1011 (N.D. Ohio 2014) reconsideration denied, No. 3:13 CV 828, 2015 WL 474319 (N.D. Ohio Feb. 4, 2015) and rev'd and remanded, No. 15-3216, 2015 WL 7252996 (6th Cir. Nov. 17, 2015).  It is unclear whether doctors typically purchase exclusively from one of the three dominant vendors.[2]

Gordon worked as an Orthofix sales representative from 2007 until March 2013.  When she was hired, she signed a sales agreement ("the Agreement")—the contract at issue in this case—in which she promised, among other things, that after she stopped working at Orthofix she would not do business with its customers, or compete with it, for one year, and would never disclose any of its trade secrets or confidential information, a term which the Agreement describes at some length, as analyzed below.  The parties disagree about how fully these terms were explained to Gordon.  She was hired as an at-will employee, which she remained for the course of her employment.

---

[1] The facts recounted here are taken from Plaintiff's statement of undisputed materials facts, Mot. Summ. J. 2–21; Defendant's response to those facts, Resp. Mot. Summ. J. 3–26, ECF No. 83; and Gordon's reply to additional material facts, Reply Mot. Summ. J. 2–30, ECF No. 88.  Where the parties disagree about the facts, the disagreement is noted.  Citations to sources outside the parties' statements of fact are attributed, as are direct quotations to the parties' facts.

[2] Orthofix's 30(b)(6) witnesses opined that once doctors have "develop[ed] a pattern [in buying or prescribing] it's unusual that they vary from that pattern," Resp. Mot. Summ. J. 6.  A witness who analyzed Orthofix's sales records determined that the average time for which a doctor remained Gordon's customer was 3.22 years.  O'Brien Dep. 115:9–10, Resp. Mot. Summ. J. Ex. E.

As a sales representative, it was Gordon's job to discover and visit doctors in central Illinois, her "territory," who might be interested in prescribing or buying Orthofix's products. Gordon would visit these doctors in an effort to "develop relationships and increase the sale of Orthofix bone growth stimulators to these customers." Resp. Mot. Summ. J. 15. To this end, Gordon was expected by her superiors to keep detailed notes on the doctors she visited, including such information as the names of the doctors' "gatekeepers" (office personnel, apparently), their "beliefs in the science of bone growth stimulation" (that is, whether they believed bone growth devices work[3]), what they liked to eat, what their hobbies were, what days they were in the office, their prescribing protocols, and their device-fitting and follow-up preferences. Mot. Summ. J. 4. Gordon was also provided with some of this information when she was first hired, in the form of a "Stim 20" report. Wood Dep. 28:1–11, Resp. Mot. Summ. J. Ex. G. Furthermore, there existed a "sales portal" that Gordon and other employees used, where email, current orders, monthly sales, and sales volumes were kept track of.

Orthofix describes the information about doctors as a "playbook," while Gordon claims that the term was never used while she worked with Orthofix. Mot. Summ. J. 4, Resp. Mot. Summ. J. 6. Orthofix's Rule 30(b)(6) witness described the playbook as "basically the bible of every sales rep," a document he instructed sales representatives on how to put together and maintain. Shallenberger Dep. 20:7–15, Resp. Mot. Summ. J. Ex. C. More amorphously, he also described it as "a document or group of documents that, when combined, is what our reps use in the field to navigate their day-to-day activities and to grow their business." *Id.* 89:14–17. It seems clear that while a category of such information existed and was circulated amongst

---

[3] Current evidence is "inconclusive as to the benefits of [the] technology," which is a $500 million per year business in the United States alone. Jeffrey Wienke and Paul Dayton, *Bone Stimulation for Nonunions: What The Evidence Reveals*, Podiatry Today, http://www.podiatrytoday.com/bone-stimulation-nonunions-what-evidence-reveals (last visited March 13, 2016).

Orthofix employees, frequently in the form of electronic communications, database entries, etc., there was no single document to which the term "playbook" refers, or which Gordon or another employee could be identified as having possessed, transferred, etc. Certainly, no party has submitted any such document for the Court's perusal. The term, despite its apparently concrete referent is categorical, rather than concretely denotative—"playbook information," but no playbook, except in the most loosely synoptic sense of the metaphor.[4]

Gordon appears to have done well in her position, growing Orthofix's business in central Illinois. She received positive reviews from her supervisors and was "very good at what she did." Shallenberger Dep. 69:13–14. In 2010, Orthofix expanded her territory from central Illinois to include parts of Chicago. However, in 2012, Orthofix took this region away from Gordon and gave it to a company called Innotek, an independent distributor of medical devices. The parties agree that Gordon began at some point to have disagreements with her manager, regional sales director Chris Summers. Orthofix claims that Gordon was disrespectful to Summers, and insisted that she be permitted to work for a different independent distributor of medical devices, that is, not for Orthofix, so as not to have to work with him.

Then, in March 2013, Orthofix also took the central Illinois territory from Gordon and gave it to Innotek. Orthofix expected and wanted Gordon to go work for Innotek, which would have obvious practical advantages, since she would be working in the same territory and with the same doctors as before. Gordon claims that the only choices Orthofix gave her were to go work for Innotek or be terminated from employment with Orthofix. Orthofix counters that Gordon was offered sales positions in New York and Austin, Texas (although the New York position was offered to Gordon much earlier, in 2012, and the deposition Orthofix cites does not support its

---

[4] Orthofix itself refers to the playbook at times, tellingly, as "the plethora of playbook information [sic]," Resp. Mot. Summ. J. 8, and states that the playbook "as a whole" is its proprietary possession, while its distributed "individual components" may not be, *id.*

4

assertion with respect to the Austin job, Resp. Mot. Summ. J. 19).  Following the decision to transfer her territory to Innotek, Gordon claims she was told in so many words that she was terminated; Orthofix claims that she called its human resources manager on March 8, 2013, and "demanded to be terminated."  Mot. Summ. J. 9, Resp. Mot. Summ. J. 19–20.

She then went to work for Orthofix's competitor, DonJoy Orthopedics ("DJO"), where she worked in the same geographic region, but for the first year sold products that (she asserts) were non-competitive with Orthofix's, like "back bracing and pain cream."  Mot. Summ. J. 11.

While employed with DJO, Gordon recruited Kelly Bizosky to work there as well. Gordon, who was friends with Bizosky, had initially recruited Bizosky to work at Orthofix as a "fitter" when Gordon was working for Orthofix.  (Fitters help fit patients with bone growth stimulators.)  When she was recruited to work for DJO, Bizosky worked as a salesperson of bone growth stimulators in Gordon's old territory.  After Gordon's year-long promise not to compete with Orthofix expired, she took over Bizosky's job and resumed selling DJO's bone growth stimulators to her former customers in central Illinois.  Orthofix contends that Gordon was using Bizosky as a cat's paw to allow DJO access to some of the doctors Gordon used to sell to during the period that Gordon was contractually barred from doing so.  As evidence of this, Orthofix points to the fact that Gordon resumed a direct sales role after her year was up, and admitted to having accompanied Bizosky to meet with doctors—her former clients— on at least two occasions.  Resp. Mot. Summ. J. 21.

## DISCUSSION

### I.    Legal Standard on a Motion for Summary Judgment

Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."

*Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (internal quotation marks omitted).  A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255).

## II.    Analysis

Orthofix's amended complaint alleges that Gordon: (I) breached the non-solicitation portion of the Agreement by taking a role at DJO within the first year after she left Orthofix and indirectly selling bone growth products through Bizosky, Am. Compl. ¶¶ 57–66; (II) breached the unfair competition portion of the Agreement by the same activities and by using Orthofix's confidential information and trade secrets to do it, *id.* ¶¶ 67–76; (III) violated her promise in the Agreement not to disclose Orthofix's confidential information and trade secrets by sharing and using customer lists, pricing information, customer needs and preferences and other information at DJO, *id.* ¶¶ 77–86; (IV) misappropriated trade secrets in violation of ITSA by the same actions, *id.* ¶¶ 87–96; and (V) tortiously interfered with Orthofix's business relations to the extent that her alleged misuse of confidential information is not pre-empted by ITSA, *id.* ¶¶ 97–

103.  Gordon now moves for summary judgment as to Counts I–III on the ground that the Agreement's restrictive covenants are unenforceable, Mot. Summ. J. 22–27; as to Count IV on the ground that none of the playbook information Gordon is alleged to have used is a trade secret within the meaning of ITSA; *id.* at 27–35; and as to Count V on the ground that the tortious interference claim is wholly preempted by ITSA, and alternatively pleading tortious interference is disfavored, *id.* at 35–36.  The Court addresses each of these arguments in turn.

### a.  Breach of Contract Claims, Counts I–III

Gordon argues that she was terminated without cause, and thus all the restrictive covenants contained in the Agreement are unenforceable, Mot. Summ. J. 22–24, and that the provisions are also unenforceable because they are not limited in scope or protective of legitimate business interests, *id.* at 24–27.

The parties provided in the Agreement that its interpretation would be governed by the laws of the state in which Gordon resided at the time of the termination of her employment. Agreement 6, Mot. Summ. J. Ex. 5.  Both parties agree that Gordon and Orthofix entered into the Agreement freely, and that Gordon resided in Illinois when her employment ended.  Thus, this Court will apply Illinois law in interpreting the contract and determining its applicability.  *See Piper Aircraft v. Reyno*, 454 U.S. 235, 243 n.8 (1981) (stating that "a [federal] court ordinarily must apply the choice-of-law rules of the state in which it sits" (citing *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941)); *In re Marriage of Adams*, 551 N.E.2d 635, 638 (1990) (recognizing the applicability of choice of law clauses in contracts) (citing *Reighley v. Cont'l Ill. Nat'l Bank & Trust Co.*, 61 N.E.2d 29, 33 (Ill. 1945)).  Federal courts' "role in interpreting a question of state law is to predict how the highest court of the state would answer the question." *Cannon v. Burge*, 752 F.3d 1079, 1091 (7th Cir. 2014) (citations omitted).

### 1. Termination With or Without Cause

Gordon argues that she was terminated without cause, and that under Illinois law such terminations render unenforceable any restrictive covenants to which a party to a contract is subjected, Mot. Summ. J. 22–24.  Orthofix responds that only bad-faith breaches of employment contracts by an employer render such provisions unenforceable, and Gordon was an at-will employee.  Resp. Mot. Summ. J. 27–31.  Moreover, Orthofix argues, it did not fire Gordon, who instead herself requested to be terminated, *id.*

Parties to a contract in Illinois promise to act in good faith.  *Osten v. Shah*, 433 N.E.2d 294, 296 (Ill. App. Ct. 1982).  Interpreting Illinois law, the Seventh Circuit has construed the requirement of good-faith dealing to mean that "a restrictive covenant that can become effective when an employee is terminated without good cause is not reasonably necessary to protect an employer's good will," and thus, not enforceable.  *Rao v. Rao*, 718 F.2d 219, 224 (7th Cir. 1983). In other words, the Seventh Circuit seemed to say that a dismissal of an at-will employee without any reason ("without good cause") but without any impermissible intent or bad faith—as an at-will employee may be terminated—precludes an employer from enforcing restrictive covenants in that employee's contract.[5]  The justification for the view is that restrictive covenants are disfavored as being restraints on trade, and the best means to prevent an employee whom one has no good reason to fire from competing with one is not to fire her.  *Id.*  This is the interpretation Gordon urges.  Mot. Summ. J. 23.

The extent to which Illinois courts have agreed with this interpretation of Illinois law is unclear.  In *Bishop v. Lakeland Animal Hospital., P.C.*, 644 N.E.2d 33 (Ill. App. Ct. 1994), the

---

[5] It is difficult to tell whether the Seventh Circuit intended this reasoning to apply to cases where an employee is terminated without good cause, but for no particular bad reason, because *Rao* involved a dismissal of an employee to prevent the employee from obtaining a contractually-stipulated benefit, plainly in bad faith.  The *Rao* court at one point explicitly described its holding as being that "a restrictive covenant is unenforceable when an employee is terminated in bad faith and without good cause."  *Rao*, 718 F.2d at 224.  As explained below, Illinois courts have taken different lessons from *Rao*.

8

Appellate Court of Illinois "agree[d] with the seventh circuit's [sic] reasoning [in *Rao*] and [found] that the implied promise of good faith inherent in every contract precludes the enforcement of a noncompetition clause when the employee is dismissed without cause," 644 N.E.2d at 36. But the Appellate Court later construed *Rao* and *Bishop* narrowly, explaining (despite the broad language in the passage quoted above) that the *Bishop* holding was limited to cases where a restrictive covenant was triggered upon an employee's termination "for any cause," rather than "for any cause whatsoever." *Am. Pest Control, Inc. v. Rakers*, 2012 WL 7050434 ¶ 15 (Ill. App. Ct. 2012). Thus, the *Rakers* court determined that parties could contract so that an at-will employee could be terminated without cause and yet be subject to restrictive covenants, whereas, *pace* the Appellate Court's reading of *Bishop* and *Rao*, the earlier decisions appear plainly to state that all dismissals without cause foreclose an employer from seeking to enforce restrictive covenants. *See Rao*, 718 F.2d at 224 (explaining that such enforcement "serves only the purpose of preventing competition—an insufficient justification for enforceability"). The Illinois Supreme Court has not clarified the issue.

However, this Court need not at this juncture try to determine how the Illinois Supreme Court would rule, because, on the materials submitted with the parties' motions, there is a genuine dispute of material fact about whether or not Gordon was terminated or, instead, chose to leave of her own accord; and, if she was terminated, whether or not she was terminated for cause; and yet again, if she was terminated without cause, whether that termination could be said in any more substantive sense to have been in bad faith.

In Illinois, termination occurs when an employer's decision to fire an employee is unequivocally communicated to the employee, regardless of the exact words used. *See Hinthorn v. Roland's of Bloomington, Inc.* 519 N.E.2d 909, 912 (Ill. App. Ct. 1988) ("There are no magic

9

words required to discharge an employee: an employer cannot escape responsibility for an improper discharge simply because he never uttered the words 'you're fired.'").  Gordon admits that she was offered at least one other employment position within Orthofix before March 2013, but had turned it down.  And she admits that she was given the "opportunity to continue servicing [her] territory as an employee of Innotek," Gordon Dep. 157:4–7, Mot. Summ. J. Ex. 4.  She also admits that she submitted her resignation on March 8, 2013.  But she claims that she was given no other option but to quit, given the relative undesirability of the position at Innotek, *id.* at 164:7–12, and given her mistrust of Orthofix based on "several instances," *id.*, in which Orthofix had materially misrepresented their intentions with respect to her employment.  Both parties agree that Gordon was told about the decision to give her territory to Innotek, and the fate of her continued employment decided, at a meeting with Mark Faucett, Orthofix's Vice President of Sale, in Chicago in March 2013.  But Gordon claims that at this meeting, she was told that she had been terminated and that he only option was to work at Innotek, which she declined— effectively, that she had been fired.  Gordon Dep. 37:4–11, Mot. Summ. J. Ex. 4.  And Jason Shallenberger, Orthofix' Rule 30(b)(6) representative, states that he was not aware of any ultimatum given to Gordon, and that she resigned rather than being terminated.  Shallenberger Dep. 77:5–6, Resp. Mot. Summ. J. Ex. C.

On the basis of the record before the Court, the Court cannot determine whether it was "clearly and unequivocally communicated," *Hinthorn*, 519 N.E.2d at 912, to Gordon that her employment was terminated, let alone what Orthofix's exact motivations were if Gordon was indeed fired.  Thus, the Court cannot determine whether the restrictive covenants upon which Orthofix sues in Counts I-III are unenforceable because of the way in which Gordon left her job, and summary judgment on the Counts for this reason is inappropriate.

## 2.   Validity of the Restrictive Covenants

Gordon next argues that because restrictive covenants can only protect legitimate business interests, and under Illinois law, Orthofix does not have a legitimate business interest in its relationship with its doctor-customers.  Mot. Summ. J. 24–27.  She further contends that her confidentiality agreement was not reasonably limited in scope, *id.* at 24, and that "playbook" information is not the sort of thing that a confidentiality agreement can protect, *id.* at 26–27. Orthofix counters that because it had near-permanent relationships with its customers, it did have a legitimate and protectable business interest.  Resp. Mot. Summ. J. 31–33, and that the confidentiality agreement was both appropriately limited in scope and that the "playbook" information was a proper topic for its protection, *id.* at 34–37.

Because restrictive covenants are restraints on trade, Illinois courts will not enforce them unless their terms are reasonable and necessary to protect an employer's legitimate business interests.  *Hanchett Paper Co. v. Melchiorre*, 792 N.E.2d 395, 400 (Ill. App. Ct. 2003). Legitimate business interests exist where (1) because of the nature of the business, customer relationships with the employer are near permanent and the employee would not have had contact with the customers but for her employment relationship, and (2) the employee gained confidential information through the employment that she attempted to use for her own benefit. *Office Mates 5, N. Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1080 (Ill. App. Ct. 1992).  To determine whether customer relationships with an employer are near-permanent, Illinois courts use a 7-factor test, considering:

> (1) the length of time required to develop the clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty in acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customer's association with the employer; and (7) the continuity of the employer-customer relationships.

*Audio Properties, Inc. v. Kovach*, 655 N.E.2d 1034, 1037 (Ill. App. Ct. 1995).

## A.  Near-Permanent Relationships

The facts before the Court are sufficient to, at the least, create a genuine issue of material fact as to whether Orthofix's relationships with its clients were near-permanent and protectable, rendering summary judgment inappropriate.

The first factor is in Orthofix's favor.  The record shows that the process of cultivating relationships with surgeons is long and complicated and generally involves multiple visits to a surgeon's office over a period of months or years before a salesperson is even granted an audience with a surgeon.  And it takes time to gather the bits and pieces of information about a surgeon's personal life and preferences, and the personal lives and preferences even of her staff, that medical device companies apparently regard as useful for persuading doctors to prescribe their products.

The second factor is also in Orthofix's favor.  Orthofix asserts that its primary investment in developing clients is made in the form of salaries to its salespeople.  Although the parties are not forthcoming in their filings before this Court, litigation of similar spats between Orthofix and DJO suggests that, with commissions included, salespeople are compensated in the multiple hundreds of thousands of dollars per year.  *Hunter*, 55 F. Supp.3d at 1009 (stating that salesman poached by DJO in 2012 offered "at least $230,000 in salary and commissions for his first year").

The third factor, like the first two, cuts in Orthofix's favor.  Persistence and multiple visits are necessary to get doctors to prescribe products, a practice Orthofix describes as a "diverse and prolonged history with the account."  Resp. Mot. Summ. J. 8.  A salesperson, in order to sell, must become familiar with a doctor's fitting preferences, follow-up preferences,

purchasing patterns, etc.  The office staff themselves must be assaulted with diligence and persistence; Shallenberger asserts that "[i]t could take years to even get past the front desk person to get to the back of the office to conduct that lunch."  *Id.*  The process of selling a bone growth stimulator is protracted.

The fourth factor, Illinois law suggests, cuts neither way.  Where an employee has close personal contact with customers, as Gordon surely did with the doctors, but the employee was just a salesperson for a product offered exclusively by the employer, the fourth factor "favors neither plaintiff nor defendant."  *Melchiorre*, 792 N.E.2d at 401.

The fifth factor, as suggested by the basis of this lawsuit in the large universe of customer information Orthofix maintained, cuts in its favor.  Orthofix recorded doctors' names, addresses, credentials, surgery days, names of office staff, beliefs in the efficacy of bone growth stimulators, and appears to have tracked whether its representatives had sent them thank-you notes, discussed various bone growth technologies, or shared certain scientific literature with them, and to have developed and maintained "plans of action" with different doctors.  Gordon's spreadsheet notes contain reminders like "STOP IN ONCE A WEEK" and "continue to strengthen relationship with [office assistant]."  Mot. Summ. J. Ex. J.  Orthofix knew a lot about these surgeons.

The sixth and seventh factors also cut in Orthofix's favor.  Orthofix's witnesses suggest that doctors tend not to vary from their loyalty to one bone growth stimulator company or another, and Gordon's notes, which identify doctors' brand loyalties ("USING COMPETITION"), suggest the same.  Mot. Summ. J. Ex. J.  The evidence suggests that doctors continued to prescribe Gordon's products, on average, for a period of years at a time.

Illinois courts have found near-permanent relations exists between employers and customers in the sale of lawn care products, *Tyler Enterprises of Elwood, Inc. v. Shafer*, 573 N.E.2d 863, 865 (Ill. App. Ct. 1991), animal feed products, *Agrimerica, Inc. v. Mathes*, 557 N.E.2d 357, 363 (Ill. App. Ct. 1990), and business awards programs, *McRand, Inc. v. van Beelen*, 486 N.E.2d 1306, 1309 (Ill. App. Ct. 1985), all of which involved a similar level of involvement and solicitousness on the part of the salesperson in cultivating a lasting relationship with clientele.  Gordon does not show that there is no question of material fact as to whether Orthofix had sufficiently near-permanent relationships with the orthopedic surgeons in central Illinois to protect that interest with restrictive covenants.

### B.  Protectability of Confidential Information and Scope of Protection

As an initial matter, Gordon's argument that the non-disclosure clause of the Agreement is overbroad is a non-starter under unambiguous decisional law.  Gordon claims that the Agreement's provision that she not disclose trade secrets or confidential information "at any time" after her employment with Orthofix, Agreement  3, Mot. Summ. J. Ex. 5, is not enforceable because it is not limited in time or geographical scope.  But "a confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved."  *Coady v. Harpo, Inc.*, 719 N.E.2d 244, 250 (Ill. App. Ct. 1999); *see* 765 ILCS 1065/8(b)(1) ("[A] contractual or other duty to maintain secrecy or limit use of a trade secret shall not be deemed to be void or unenforceable solely for lack of durational or geographical limitation on the duty[.]").

Gordon also argues that none of the "playbook" information she is alleged to have misappropriated in working for DJO is confidential information within the meaning of the Agreement.  Mot. Summ. J. 26.  The Agreement defines "confidential information" as

"information acquired by the Employee in the course and scope of his activities for Orthofix that is not generally known or disseminated outside the Company . . . or that Orthofix indicates through its policies, procedures, or other instructions should not be disclosed to anyone outside Orthofix."  Agreement 3.  The Agreement then includes a non-exhaustive list of materials (which are also assertedly trade secrets), which contains such items as "customer lists, customer needs and preferences, customer purchasing histories internal financial data, research and development regarding existing and prospective customers," and like information.  *Id.*  The Agreement specifically mentions "reports [which] will outline which physicians and other customers in Employee's territory use which particular type of products, [and] the volume and purchasing history of physicians and other customers with respect to specific products."  *Id.*

There is no doubt that Gordon's detailed spreadsheet notes on the doctors she sold to, Resp. Mot. Summ. J. Ex. J., and the "Stim 20 reports," Wood Dep. 28:1–11, Resp. Mot. Summ. J. Ex. G, are such information, so the only question is whether the Agreement could permissibly make them subject to confidentiality.  Gordon's argument is mostly reserved for the assertion that the customer information she gathered and used while at Orthofix cannot qualify as a trade secret under ITSA, and so the Court similarly reserves most of its discussion of these materials for the motion for summary judgment on Count IV, below.  However, the Court finds instructive the distinction drawn by the Sixth Circuit in another case involving a former Orthofix sales representative poached by DJO.  There, the Court noted, citing the Third Restatement of Unfair Competition, that there are three basic kinds of information relevant to non-disclosure agreements, two of which are permissibly protectable by an employer.  *Hunter*, 2015 WL 7252996, at *1.  The first is trade secrets, properly understood, which are protected categorically by the laws of the jurisdiction.  *Id.*  The second is other confidential information, which, while

not protected by trade secrets laws, a contract may permissibly cover. *Id.* ("[A] nondisclosure

agreement prohibiting the use or disclosure of particular information can clarify and *extend* the

scope of an employer's rights beyond the protection afforded by trade secret statutes.").  Finally,

there is general skill, knowledge, or training—matter not protectable by a contract. *Id.*

The divisions amongst these kinds of information are created by state law.  Illinois

distinguishes between information that may be made confidential and general skills in this way:

> [W]hile an employee, at the termination of his employment, can take with him
> general skills and knowledge acquired during the course of his employment, he
> may not take confidential particularized information disclosed to him during the
> time the employer-employee relationship existed which are unknown to others in
> the industry and which give the employer advantage over his competitors.

*Burt Dickens & Co. v. Bodi*, 494 N.E.2d 817, 819 (Ill. App. Ct. 1986).

While some of the more general information Gordon is alleged to have taken with her

may be so broad as to fall under general skills and knowledge, such information as a doctor's

prescribing history, his or her belief in the science of bone growth stimulation, and the various

collected minutiae of details about Orthofix's ongoing relationship with the doctors surely does

qualify as "particularized information."  Illinois law is replete with instances where the sort of

information the Agreement protects was afforded confidential information status.  *See, e.g.*, *The*

*Agency, Inc. v. Grove*, 839 N.E.2d 606, 615 (Ill. App. Ct. 2005) (holding client profiles

confidential where profiles contained identities, client business cycles, expiration dates, and

personnel preferences); *Tower Oil & Technology Co. v. Buckley*, 425 N.E.2d 1060, 1063 (Ill.

App. Ct. 1981) (holding confidential information acquired in meetings where salesmen

exchanged ideas concerning servicing customers and discussed new products and the proper

application thereof); *Lyle R. Jager Agency, Inc. v. Steward*, 625 N.E.2d 397, 402 (Ill. App. Ct.

1993) (holding that worksheets used to determine insurance premiums for customers were

confidential).  Furthermore, "the compilation, generation, and use of information and the circumstances under which the information was maintained are also important in determining confidentiality," *Lifetec, Inc. v. Edwards*, 880 N.E.2d 188, 197 (Ill. App. Ct. 2007), so that compilations of publicly-available information, if they took time and effort to create, may be protected by confidentiality agreements.

The information covered by Gordon's confidentiality clause in the Agreement is plainly of this kind.  Under Illinois case law, The Agreement is neither overbroad in its temporal scope, nor does it purport to restrain the use of information that may not properly be named confidential.  Gordon's motion for summary judgment fails as to Count III.

**b.   Illinois Trade Secrets Act, Count IV**

Gordon argues that her alleged use of the "playbook" information cannot be a violation of ITSA because Orthofix did not take adequate steps to keep the information confidential, and because the information is readily ascertainable.  Mot. Summ. J. 27. Orthofix responds that the "playbook" information was valuable and difficult to acquire, and is hence protectable under ITSA, and that it took reasonable measures to keep the information secret.

ITSA protects against the misappropriation of "trade secrets," which it defines this way:

(d) "Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

17

765 ILCS 1065/2.  While a mere list of customers, where that information is easy to acquire or well-known within a particular industry, is usually not sufficiently secret to warrant trade secret protection, pricing formulas and the business history and data used to generate them generally are.  *See Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439, at *5 (N.D. Ill. Dec. 15, 2014) (holding that customer lists in the packing materials industry were trade secrets, but "product matrices," containing information about vendors, vendor names, product costs, and delivery information were).  To determine whether information about customers is "generally known" or, on the other hand, sufficiently recondite to qualify for protection, courts look to the amount of effort it takes to acquire and compile the information.  *See Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772  N.E.2d 768, 781 (Ill. App. Ct. 2002) (holding that trial court abused its discretion in finding a customer list a trade secret where the list could be duplicated merely by looking in the yellow pages or a FOIA request); *Hamer Holding Group, Inc. v. Elmore*, 560 N.E.2d 907, 912 (holding customer list not a trade secret where it could be easily duplicated by reviewing lists from Secretary of State's office, distilling them by geographic region, and updating contacts and telephone numbers).

Here, not only did some of the lists that Orthofix calls "playbook" information clearly take a great deal of time and effort to compile, they contained information that only Orthofix salespeople had, because it was in fact a record of the salespeople's individual and perhaps unique efforts.  See Resp. Mot. Summ. J. Ex. J.  The lists also appear to contain records of products Orthofix sold to doctors over the years.  Of the handful of heterogeneous documents Orthofix supplied with its motion, it appears that in addition to the names of doctors, their staff, what kind of doctors they were, and whether they were DO's or MD's, Orthofix's salespeople used charts to track the number of lumbar and cervical devices sold, whether a given doctor was

a "non believer" or "using competition," the doctor's surgery and clinic days, and what kind of materials the salesperson had showed to a doctor.  Each doctor also had a "notes" field associated with them, where things like the salesperson's intention to discuss with a doctor "why he's no longer using our product" were memorialized.  Although Orthofix did not supply many of these documents with its response to Gordon's Motion for Summary Judgment, the number of doctors contained on the list it did supply, coupled with the testimony of Orthofix's 30(b)(6) witness about the importance of compiling this information to salespeople's practice, is sufficient at summary judgment to show that Orthofix's "playbook" information took a great deal of time and effort to acquire, and was of great value to it as a corporation.  Without this information— details about its client base and the state of its relationship with each doctor—it would be impossible for Orthofix to strategize about how to continue selling products to given doctors, or train new salespeople.  Indeed, Trent Wood, a regional sales director at Orthofix, identified the "Stim 20" as a document that would have been given to Gordon to bring her up to speed on the doctors in her territory, when she replaced her predecessor.  Wood Dep. 27:24–2817, Ex. G.

It is perhaps true, as Gordon argues, that all of this information is publicly available in the sense that getting it is "a matter of asking questions."  Mot. Summ. J. 33.  But those questions had to be asked over a long period of time, over the course of many visits, and integrated into a corporate strategy, then memorialized in a document on a regular basis that superiors and salespeople apparently used to go about the business of selling bone growth stimulators.  The information is of sufficient economic value to warrant trade secrecy protection under 765 ILCS 1065/2.  *Accord Hunter*, 55 F. Supp. 3d at 1012–13 ("Hunter makes much of the fact that the information contained in the playbook . . . can be discovered by a scan through the local phone

book or a Google search. However, that items may be individually available through public resources is not dispositive.").

Orthofix has also provided enough information about the efforts it took to keep this information secret to create a genuine issue of material fact. 765 ILCS 1065/2(d)(2). "Whether the measures taken by a trade secret owner are sufficient to satisfy the Act's reasonableness standard ordinarily is a question of fact for the jury." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 725 (7th Cir. 2003). "[O]nly in an extreme case can what is a 'reasonable' precaution be determined [as a matter of law], because the answer depends on a balancing of costs and benefits that will vary from case to case." *Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir.1991). At this phase, it is sufficient to observe that a jury could determine that Orthofix made reasonable efforts to keep the "playbook" information secret by requiring all employees who used it to sign nondisclosure agreements (and suing those who it perceived to have violated them). *See Playwood*, 342 F.3d at 725–26 ("[I]t is well established that the formation of a confidential relationship imposes upon the disclosee the duty to maintain the information received in the utmost secrecy . . ." (internal citation omitted)).

Gordon has not shown, as she must to prevail at summary judgment, that there is no dispute of material fact as to Orthofix's ITSA claim and that she is entitled to judgment as a matter of law. Her motions fails as to Count IV.

### c.   Collateral Estoppel

Gordon argues that issue preclusion, or collateral estoppel, requires summary judgment in her favor, pointing to two district court cases, one from the Eastern District of Michigan, *Orthofix Inc. v. Lemanski*, No. 13-11421, 2015 WL 1488267 (E.D. Mich. Mar. 31, 2015), and one from the Northern District of Ohio, *Orthofix, Inc. v. Hunter*, 55 F. Supp. 3d 1005, 1007

(N.D. Ohio 2014). In the latter, factually analogous to the instant case in a number of respects, the district court after a bench trial found that Orthofix had not taken sufficient steps to keep the "playbook" information secret, thus failing to qualify for protection under the Ohio analogue to ITSA, *see* R.C. § 1333.61(D). 55 F. Supp. 3d at 1014. The *Hunter* court further found that the confidentiality agreement covered no more ground than the Ohio trade secrets statute. *Id.* at 1014–15.

The Lemanski of the first-named case was Hunter's business partner; both left Orthofix to work for DJO and were contemporaneously sued by their former employer. After the *Hunter* court's judgment, the *Lemanski* court granted partial summary judgment for Lemanski on the basis of issue preclusion. *Lemanski*, 2015 WL 1488267, at *3. The doctrine dictates that when four conditions are met, a party is estopped from asserting a claim or defense that has already been adjudicated. Those conditions are:

> (1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action.

*H-D Michigan, Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 760 (7th Cir. 2007). Several facts counsel against application of collateral estoppel in the instant case. First, *Hunter* was reversed and remanded for further proceedings by the Sixth Circuit late in 2015. *See Orthofix, Inc. v. Hunter*, No. 15-3216, 2015 WL 7252996, at *7 (6th Cir. Nov. 17, 2015). A Rule 60(b) motion remains pending before that court. ECF No. 133. Second, the issue before this Court is not the same as the issue before either the *Hunter* or *Lemanski* courts. Those cases were factually intertwined; the defendants were collaborators. While Orthofix made similar arguments about "playbook" information in those two cases, the factual scenarios were somewhat different. Third, the law applied by the district court and then the court of appeal was different from what

21

this Court must apply, since Ohio statutes and precedent are not the same as Illinois law and precedent, despite the similarities (say) in the trade secret statutes.

In any case, even if collateral estoppel were to apply, given the Sixth Circuit's reversal of the *Hunter* court, the doctrine would not now counsel granting Gordon's motion for summary judgment.

### d. Preclusion of Tort Law Claims, Count V

Finally, Gordon argues that Orthofix's claims of tortious interference must be dismissed because they are pre-empted by ITSA. Mot. Summ. J. 35–36. Orthofix responds that its tortious interference claims are based not on behavior violative of trade secret law, but upon only misappropriation of confidential information in violation of the Agreement, and additionally include Gordon's recruitment of Bizosky to act as a proxy for selling bone growth products to Gordon's clients during the year when she regarded herself as unable to sell them on her own. Resp. Mot. Summ. J. 42–43.[6]

ITSA is the sole remedy for tort claims arising from the misappropriation of a trade secret. 765 ILCS 1065/8(a). ITSA "abolishes claims other than those based on contract arising from misappropriated trade secrets, replacing them with claims under the Act itself." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir.2005) (emphasis added). This means that the common law of Illinois cannot be used to bring a tort claim for the misappropriation of trade secrets, and cannot be pleaded as an alternative theory to an ITSA claim. *See Spitz v. Proven*

---

[6] To state a claim for tortious interference with business relations, a plaintiff must allege:

> (1) a reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of the expectation, (3) a purposeful interference by the defendant that prevents plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damage to the plaintiff resulting from the defendant's interference.

*Atanus v. American Airlines, Inc.*, 932 N.E.2d 1044, 1048 (Ill. App. Ct. 2010); see also *Fishman v. Estate of Wirtz*, 801 F.2d 520, 546 (7th Cir. 1986).

22

*Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014) ("Illinois courts have read the

preemptive language in the ITSA to cover claims that are essentially claims of trade secret

misappropriation, even when the alleged 'trade secret' does not fall within the Act's definition.");

*Playwood*, 1999 WL 529572 at *3 ("The ITSA did not establish a parallel statutory regime to

complement the common law; rather, it abolished common law theories of misuse of such

[secret] information.... Unless defendants misappropriate[ ] a statutory trade secret, they d[o] no

legal wrong.").

      The question, then, is whether Orthofix's claims for tortious interference grounded in the

misappropriation of confidential information, as opposed to trade secrets, in violation of the

Agreement, are pre-empted by ITSA.  Orthofix does itself no favors in arguing that every

conceivable piece of "playbook" information is a trade secret just as surely as it is confidential; If

that reasoning is accepted, every piece of misappropriated information on which the tortious

interference claim is based must logically be, by Orthofix's lights, trade secret information, or

"essentially" so, *Proven Winners*, 759 F.3d at 733, and thus pre-empted by ITSA.  But Orthofix

also argues, and this Court agrees, as explained above, that the confidential information protected

by a contract is necessarily a broader category than trade secret information protected by ITSA.

*Hunter*, 2015 WL 7252996, at *1.  To prevail at summary judgment, Gordon must show that

there is no dispute of material fact attending on the tortious interference claim, and she is entitled

to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  But if there are concededly some facts

that may not be "essentially" trade secrets, but rather only confidential information, and their use

may have constituted tortious interference under Illinois common law, then Gordon cannot do so.

*See Universal Imagine Print Grp., LLC v. Mullen*, No. 07 C 6720, 2008 WL 62205, at *3 (N.D.

Ill. Jan. 4, 2008) ("Several of the categories of information classified as Confidential

Information, such as personnel information or other information not available to the public, may prove to be outside the scope of a trade secret because its continued secrecy does not provide economic value to [Plaintiff].").  In part because the exact scope, and success or failure, or Orthofix's trade secret and breach of contract claims has not yet been determined, Gordon cannot show that she is entitled to judgment as a matter of law.

Furthermore, Orthofix has clearly alleged, as the Court suggested it do in the Court's January 13, 2014 Order, ECF No. 18, that Gordon solicited Bizosky to sell bone growth stimulators to her former clients, and has supported that allegation adequately with evidence to survive summary judgment.  *See*  Bizosky Dep. 29:1–32:20.  Bizosky was hired for just one year to serve Gordon's former clients in central Illinois, despite her lack of sales experience, then replaced by Gordon when the year was up; Gordon accompanied Bizosky on some of the visits to her biggest former clients.  Resp. Mot. Summ. J. 21.  A reasonable jury could conclude that this constituted "purposeful interference" with Orthofix's business expectancies.  *Atanus v. American Airlines, Inc.*, 932 N.E.2d 1044, 1048 (Ill. App. Ct. 2010).

e. **Remaining Motions**

Both the parties moved, ECF Nos. 77, 84, for leave to file the exhibits to their motions under seal.  These motions are granted, and the parties are directed to file their exhibits under seal forthwith.  Gordon's motion to exceed the type volume limitation is granted.  Because the case material Gordon supplied in her motion to supplement the record, ECF No. 94, was irrelevant to the present matter and the Court did not rely on it, it is denied.

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment, ECF No. 76 is DENIED; her motion for leave to file exhibits thereto under seal, ECF No. 77, is GRANTED; Plaintiff's

motion for leave to file exhibits in response under seal, ECF No. 84, is GRANTED; Defendant's motion for leave to exceed the type volume limitation in reply, ECF No. 86, is GRANTED; her motion for leave to file the exhibits thereto under seal, ECF No. 87, is GRANTED; and her motion for leave to supplement, ECF No. 94, is DENIED.

Entered this 24th day of March, 2016.

s/ Sara Darrow

SARA DARROW
UNITED STATES DISTRICT JUDGE