UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| ORTHOFIX INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MELISSA GORDON, )<br>)<br>Defendant. )<br>)<br>) | Case No. 1:13-cv-01463-SLD-TSH |

ORDER

Before the Court is Defendant Melissa Gordon's motion in limine to exclude the testimony of Orthofix, Inc.'s ("Orthofix's") expert, Mike O'Brien.  ECF No. 90.  Also before the Court are Gordon's motion for leave to file exhibits to this motion under seal, ECF No. 89; Orthofix's motion to leave to file under seal an exhibit to its response, ECF No. 93, and Gordon's motion to leave to file supplemental documents in support of the Daubert motion, ECF No. 97.  For the following reasons the motion to exclude is DENIED, the motions to file under seal also DENIED, and the motion seeking leave  to file supplemental documents GRANTED.

**BACKGROUND[1]**

Gordon sold bone growth stimulators for Orthofix, which is in the business of selling such devices to doctors (the devices purportedly aid the healing of broken bones).  She did this from 2007 until March 2013, when she began working instead for one of Orthofix's competitors, DonJoy Orthopedics ("DJO").  Gordon had worked for Orthofix in the Central Illinois region.

---

[1] The material here is drawn from the parties' statements of facts in the motion in limine, the response to that motion, ECF No. 92, and the exhibits to both motions.

1

According to Orthofix, she turned around and, after the expiration of a one-year period in which she had promised not to sell directly competing products, began selling to the very same doctors in this region that she had worked with while an employee of Orthofix. Even before the year was up, and as early as March 2013, Orthofix claims, Gordon was visiting doctors in central Illinois and aiding in the sales of DJO bone growth stimulators, while claiming only to be selling products that did not violate the terms of her non-compete clause. Orthofix claims that its sales to the doctors Gordon had cultivated while working for Orthofix dropped dramatically as a consequence of Gordon's switched allegiance.

Orthofix alleges in the instant action that (I-III) Gordon breached the non-solicitation, unfair competition, and confidential information/trade secrets portions of a contract she signed when she was hired; (IV) that she misappropriated Orthofix's trade secrets in violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1–9; and (V) that she tortiously interfered with Orthofix's business relations with the doctors. Am. Compl., ECF No. 23. In order to show the amount of its alleged losses in sales pursuant to all these counts, Orthofix has retained O'Brien, a Certified Public Accountant.

O'Brien has a B.S. from the University of Kansas and an M.B.A. from the same institution. He has worked in accounting in some form for more than 40 years, and has been deposed or has testified in 9 lawsuits over the course of the last 4 years.

O'Brien's Second Amended Report in this case, Mot. Limine Ex. E, arrives at an estimate for Orthofix's total sales lost as a result of Gordon's departure. To get this number, O'Brien looked at Orthofix's sales to 22 doctors identified by Orthofix as doctors whom Gordon has "solicited . . . or has assisted others [in soliciting]." *Id.* at 2. O'Brien then took the year before and after Gordon left Orthofix and determined the actual sales of Orthofix's bone growth

stimulators to each doctor in each year. (To determine the sales, O'Brien looked, among other documents, at Orthofix's monthly sales data for 2010 through 2014.) By taking the difference between sales in the year preceding and proceeding Gordon's departure, O'Brien determined the drop in sales for each doctor, which he then added together to arrive at Orthofix's total decline in sales for the 22 doctors. O'Brien compared the drop in sales to the 22 doctors with the drop in sales to doctors in the region Gordon worked in, termed by Orthofix "Spine North." He determined how much, proportionally, sales to the 22 doctors fell, and how much they fell in the same time period for the other doctors in the Spine North region. (Sales to these other doctors fell substantially less.) O'Brien deemed the difference between the drop in sales to the 22 doctors, and what that drop would have been had they only lost as much sales as the other doctors, to be the loss amount in that year. O'Brien then determined that Orthofix's average customer tenure is at least three years, and estimated that Orthofix's loss in sales would be 67% of the initial loss in the year after the measured loss, and 33% the year after that. Thus, the equivalent effective lost sales period was the first year of loss plus 67% plus 33%, or 2 years. O'Brien's total estimated loss amount was twice the amount he estimated Orthofix lost in the first year after Gordon's departure.

## DICSUSSION

I.   **Legal Standard on a Motion to Exclude Expert Testimony**

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles

3

and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

District courts act as gatekeepers "to ensure that all admitted expert testimony satisfies the Rule's reliability and relevance requirements." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993)). However, the district court's role is to evaluate experts based "solely on principles and methodology, not on the conclusions that they generate." *Merrell Dow*, 509 U.S. at 595. Similarly, the reliability of the facts on which an expert bases his evaluation is not a matter the district court evaluates in its gatekeeping function under 702. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir.2000) ("soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact"). Rather, the jury remains "the arbiter of the weight and credibility of expert testimony." *Stollings*, 725 F.3d at 765.

Rule 702 and *Merrell Dow* mandate a three-part analysis before a district court admits expert testimony. The court must (I) determine whether the witness is qualified by knowledge, skill, experience, training, or education; (II) whether the expert's methodology is scientifically reliable; and (III) the testimony must assist the trier of fact in understanding the evidence or determining a factual issue. *See Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010); *Sys. Dev. Integration, LLC v. Computer Sciences. Corp.*, 886 F. Supp. 2d 873, 877 (N.D. Ill. 2012). "The goal of Daubert is to assure that experts employ the same intellectual rigor in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007).

II.    **Analysis**

### a. Motion to Exclude Expert Testimony

Gordon argues (I) that O'Brien lacked a basis for selecting the 22 doctors upon which he performed his loss comparison, Mot. Limine 7–9; (II) that O'Brien did not consider other possible causes of the decline in sales amongst the 22 doctors, *id.* at 9–14; (III) that O'Brien lacked justification for using Spine North as a comparison group for the 22 doctors, *id.* at 14–16; (IV) that O'Brien relied on clearly unreliable data, *id.* at 16–17; (V) that O'Brien should have considered DJO's sales numbers, *id.* at 17–18; and that O'Brien's use of loss estimates over three years is flawed, *id.* at 18–19.

As an initial matter, it is uncontested that O'Brien is qualified by knowledge and experience. He has practiced as a CPA for over 40 years. And it is uncontested that the information upon which he aims to opine would assist the trier of fact in determining a factual issue—the loss amount to Orthofix, should it prevail on any of its claims. Gordon's arguments, insofar as they address the standards of admissibility for expert testimony at all, seem to go to the sufficiency of the evidence upon which O'Brien relies, and to the reliability with which O'Brien applies the methods of accounting to the evidence before him. The reliability of accounting methods per se does not appear to be in dispute.

Gordon argues that O'Brien's data is "cherry-picked," Mot. Limine 7, because 22 doctors, rather than all of the doctors Gordon sold to while working at Orthofix, were selected by Orthofix and given to O'Brien for analysis. This is not an attack on the way O'Brien rendered the opinion; it is an attack on quality and selection of the evidence itself. But "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718. There is no suggestion here that

5

some flaw in O'Brien's application of accounting methods caused him to select this information; rather, the suggestion is that because the doctors were supplied to O'Brien by Orthofix's counsel, and consist of doctors whose losses were greater than other doctors whom Gordon sold to while at Orthofix, they are a suspect ground from which to infer loss. But the reliability and weight of the evidence is not an issue for a motion under *Daubert*, but for the trier of fact to determine. For this reason, data supplied to expert accountants by counsel as a basis for their opinions is routinely found by courts in this circuit to be unproblematic. *See Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 808 (7th Cir. 2013) ("That the expert accountant . . . could opine on future earnings on the basis of information supplied *by counsel* should make clear that the reliability of the data itself is not the object of the *Daubert* inquiry."); *Stollings*, 725 F.3d at 766–67 (reversing district court's exclusion of expert testimony where district court approved of methodology but deemed key data inputs to expert's model to be unreliable).

The Court notes that it makes perfect sense for Orthofix to seek to show losses as to doctors whom, it seeks to prove at trial, Gordon sold to when she went to DJO. Assuming the set of doctors Gordon sold to while at Orthofix is not perfectly duplicative of the doctors she sold to at DJO, it would be illogical to incorporate into a loss estimate doctors whose purchases from DJO over Orthofix are not alleged to have contributed to Orthofix's losses. Insofar as Orthofix has engaged in "cherry-picking" by seeking damages from loss associated only with those doctors to whom its sales fell the most, the appropriate venue to assault that practice is adversarial testing—presentation of evidence and cross-examination of witnesses. Finally, the fact that, as Gordon alleges, O'Brien has revised the numbers in his report several times to reflect changing quantities and doctors provided him by Orthofix does nothing to suggest that O'Brien's credibility or proficiency as an expert should be questioned.

6

Gordon argues that O'Brien's failure to consider other causes for a decline in the 22 doctors' sales renders his testimony inadmissible. Gordon does not say how this supposed failure could be taken to affect the admissibility of his testimony under Rule 702. The claim must be that O'Brien has failed to apply accepted accounting principles to the evidence in failing to consider other causes, but Gordon does not explain how this might be so. Instead, Gordon just argues that many other factors than unfair competition could have caused the decline in sales, like loss of goodwill amongst the doctors and expertise on Orthofix's sales staff after the departure of a key salesperson. All of these issues of causation are questions of fact that a jury is well equipped to weigh. O'Brien never claims his report shows that Gordon's departure was a factor, or the factor, in Orthofix's loss of sales, or that the report establishes causation. Rather, as he admits and explains, the report *assumes* that Gordon's departure prompted a loss in sales, and sets out to quantify that loss amongst certain doctors over time on the basis of the initial assumption. O'Brien Report 2. "It is entirely appropriate for a damages expert to assume liability for the purposes of his or her opinion. To hold otherwise would be illogical." *Computer Sciences*, 886 F. Supp. 2d at 882.

Gordon argues that O'Brien's use of the Spine North region, in which Gordon practiced, as a "yardstick," is an inappropriate application of accounting principles. "An expert's choice in data sampling is at the heart of his methodology. A yardstick approach is an acceptably reliable method . . . for calculating lost profits only if the benchmarks . . . are sufficiently comparable that they may be used as accurate predictors of what the target would have done." *CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815, 824 (S.D. Ind. 2012). However, Gordon makes no argument as to why the Spine North region was an inaccurate comparator, perhaps because the region concededly includes each doctor from whom Orthofix is alleged to have lost sales. Spine

7

North was Gordon's territory when she worked at Orthofix. The 22 doctors are being compared to the other doctors in that region. It is difficult to imagine more like comparators, differing from the 22 doctors as they do neither in geographical location nor in any other measurable variable that Gordon points to.

Gordon's arguments that O'Brien relied on unreliable data and should have considered DJO's sales numbers again go to the weight of the evidence, and are questions for the trier of fact, not indicia of any failure on O'Brien's part to apply generally accepted accounting principles. It makes sense that O'Brien should, in seeking to quantify Orthifix's lost profits, prepare a report quantifying Orthofix's lost profits.

Finally, Gordon argues that O'Brien's use of loss estimates for the 2 years following the measured period is flawed. But Gordon again does not explain how such a projection fails to accord with accounting principles. Given O'Brien's uncontested estimation of the average period of customer loyalty at three years, O'Brien's assumption, although he does not spell it out, seems to be that of the doctors who stopped buying Orthofix bone growth stimulators, some of them would not have stopped purchasing from Orthofix over time anyway, until eventually Orthofix ceased to suffer from their loss as a direct consequence of Gordon's departure. *See Hunter* Tr. 538:3–16, Resp. Mot. Limine Ex. N. As O'Brien averred, his numbers would appear to represent a conservative estimate, assuming a slightly shorter period of average customer tenure than the data actually reflect. *Id.*

Nothing Gordon offers suggests that O'Brien inappropriately applied accounting practices to the evidence in this case, or that that evidence is an insufficient ground on which to base his conclusions. Rather, all her claims go to the weight a fact-finder should place on his testimony. The Court is satisfied at this phase that O'Brien is sufficiently qualified, and his

8

(relatively simple) method of analysis sufficiently reliable, not to be barred in limine from offering expert testimony. *See Myers*, 629 F.3d at 644.

### b. Motion to Supplement and Motion to File Under Seal

Gordon asks in her motion for leave to supplement the record that the Court consider a Magistrate Judge's ruling in a similar case, *Orthofix v. Lemanski*, No. 13-11421 (E.D. Mich. Sept. 29, 2015). The motion is granted.

Both parties seek leave, as they have previously done in this litigation, to file certain exhibits to their motions under seal. The motions refer, by way of justification, to a Stipulated Protective Order, ECF No. 25, which the parties agreed to and which was entered by the Court. However, the stipulated order confirms that the parties must conform, in seeking leave to file documents under seal, with Local Rule 5.10(A)(2). The Rule provides:

> A party who has a legal basis for filing a document under seal without prior court order must electronically file a motion for leave to file under seal. The motion must include an explanation of how the document meets the legal standards for filing sealed documents. The document in question may not be attached to the motion as an attachment but rather must be electronically filed contemporaneously using the separate docket event "Sealed Document."

While the parties have conformed to the Rule inasmuch as they have sought leave by motion to file documents under seal, and not attached those documents to their motions, they have failed to comply with the rule inasmuch as they have not filed the documents using the "Sealed Document" event. The parties have instead sent copies of the documents to chambers as "courtesy copies." The practice does not conform with the local rule and is unacceptable. Furthermore, the parties have simply indicated in their motions that the documents in question have been designated "Confidential" by agreement of the parties, and offer this as sufficient reason that the documents be filed under seal. This is inadequate; as the Rule states, motions to file under seal must provide a legal basis for granting the request. The parties' motions for leave

9

to file under seal are denied for both of these reasons, with leave to refile in conformity with this Order.

The Court notes that in the present Order, it has particularly relied on O'Brien's second amended report, attached to Gordon's Motion to Exclude as Exhibit E, but only attached to the copy of that motion sent to chambers. Gordon is directed to refile this document immediately, and, if she seeks to do so under seal, explain why, remembering that "[t]he Court does not approve of filing documents under seal as a general matter," L.R. 5.10(A)(2).

> Information that affects the disposition of litigation belongs in the public record unless a statute or privilege justifies nondisclosure. [The Seventh Circuit] explained in *Baxter International, Inc. v. Abbott Laboratories*, 297 F.3d 544, 545–46 (7th Cir.2002), that "[s]ecrecy is fine at the discovery stage, before the material enters the judicial record. . . . But those documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality."

*United States v. Foster*, 564 F.3d 852, 853 (7th Cir. 2009) (citation omitted).

## CONCLUSION

Accordingly, Defendant's Motion In Limine to exclude expert testimony, ECF No. 90, is DENIED. The parties' motions to file documents under seal, ECF Nos. 89, 93, are DENIED with leave to refile as explained herein, and Defendant's Motion to Supplement the Record, ECF No. 97, is GRANTED.

Entered this 31st day of March, 2016.

s/ Sara Darrow<br>
SARA DARROW<br>
UNITED STATES DISTRICT JUDGE